UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SUE BELL | CIVIL ACTION NUMBER: |
| VERSUS | SECTION: |
| HERCULES LIFTBOAT COMPANY, L.L.C | JUDGE: |
| | MAGISTRATE: |

### PETITION FOR DAMAGES

NOW INTO COURT, through the undersigned counsel, comes SUE BELL who respectfully requests redress for the following reasons, to-wit:

1.

Jurisdiction and Venue

The jurisdiction of this Honorable Court is invoked Pursuant to 28 USC § 1331 "Federal Question" and accordingly plaintiff specifically seeks relief pursuant to the Title VII of the Civil Rights Act of 1964 for damages as well as over all state law claims.

2.

Venue is proper pursuant to 28 USC § 1391 (b)(1) in that the defendant, Hercules Liftboat, L.L.C. , is located in Lafayette Parish which lies within the jurisdiction of this Court.

3.

Parties

PLAINTIFF:

Sue Bell is a major domiciled in the Parish of Lafayette, State of Louisiana.

4.

DEFENDANT:

Hercules Liftboat Company, L.L.C. (Hereinafter Hercules) is a non-Louisiana Company licensed to do and doing business in Louisiana whose Principal Business Establishment in Louisiana is located at 151 Southpark Dr., 2nd Fl., Lafayette, LA 70508.

5.

Plaintiff, a former employee of Defendant, Hercules, was wrongfully terminated on the basis of her cancer disability and/or being regarded as disabled as those terms are defined by law.

6.

Defendant, Hercules, was aware of the disability of Ms. Bell and refused to reasonably accommodate her disability although the company had the means to accommodate Ms. Bell.

7.

The specific facts of the employment of Plaintiff, Sue Bell are set out in pertinent part as follows from Plaintiff's perspective:

8.

Ms. Bell was hired in March 2007 as an estimator, cost controller.

9.

Ms. Bell was provided the opportunity to reorganize and establish protocols with little to no management directions. Thus, creating a dry dock division to reduce the number of days that the fleet in Hercules Liftboat spent at dry dock. No reorganization directions were provided Ms. Bell during this reorganization process.

10.

Ms. Bell implemented the improvements and project management successes which were reported to both then president Randy Reed and VP of finance Renee Pitre on a regular basis.

11.

Several months after her hire, Ms. Bell was awarded a $15,000 yearly raise. In February 2009 then president Randy Reed visited her and provided her with a letter from Corporate of an additional promised cash retention incentive bonus $14,700 to be payable March 1, 2010 if she remained with Hercules as an employee. Mr. Reed also discussed during that meeting a separate HERO bonus of $9,257.43 earned for her 2009 performance, and provided Ms. Bell with confirmation of 1,500 shares of stock options he explained then to be worth $30,000. Hercules stock then was at $21.00 per share.

12.

The 1,500 award of shares opted 1/3 to vest on February 25, 2010, 1/3 to vest February 25, 2011, 1/3 to vest on February 25, 2012.

13.

In February 2010 Hercules again awarded Ms. Bell another 2,639 shares of restricted stock pursuant to Hercules long term incentive plan due to the positive results surrounding her position. The 2,639 restricted stock was to vest 1/3 on February 24, 2011, 1/3 on February 24, 2012, and 1/3 on February 24, 2013.

14.

All of these awards and recognition were awarded due to a direct result of Ms. Bell's outstanding positive performance .

15.

Hercules was able to reduce the number of days of the fleet at dry dock with cost savings and revenue opportunity of substantial amounts.

16.

The dry dock division was created under Mrs. Bell and when she began, the dry dock division had no project management protocols or management principles in place until Ms. Bell's arrival.

17.

Ms. Bell designed and maintained project management spreadsheets and budget tracker spreadsheets to assist in the reorganization efforts. These spreadsheet tools enabled "real time" cost and project management analysis.

18.

Prior to her arrival USCG event days were at 60+ days on topsides and 90+ days on hulls. Ms. Bell assisted in reducing the average USCG turnaround average is 39 days.

19.

At the time of her hire, Ms. Bell was directly supervised by Randy Reed.  Mr. Reed was supervised by Todd Pellegrin , who joined the company in March 2006.

20.

Mr. Reed left the employment of Hercules and was replaced by Byron Allemand on October 1, 2009.

21.

November 2009, Ms. Bell was diagnosed with Cancer.

22.

After Ms. Bell was diagnosed with cancer she was placed on short term disability through her employer January 20, 2010 to July 19, 2010. The short term disability benefits were funded through Hercules.

23.

Ms. Bell subsequently had a surgery related to the cancer which took place in February 2010 with weeks of difficult radiation and treatment following.

24.

Ms. Bell had a really difficult medical time and discussed partial disability with Hercules Corporate HR. They advised it was easier for them to track Ms. Bell's time off as full disability, and thus six months full disability was approved. During that time, IT came to Ms. Bells' home and set up a computer with citrix, a wireless router and Hercules laptop as well as citrix on her personal computer in order that she could continue to conduct business as she could during her time of treatment.

25.

Ms. Bell returned to work, still under medical duress, in later July 2010.

26.

In March, 2010, Ms. Bell's oncologist began prescribing the post-cancer medications that Ms. Bell "must" take for percentage of survival, and the medicine had devastating side effects.

27.

The first medication, Aromasin, had substantial effects on Ms. Bell , including her coping skills.

28.

Because of the side effects, Ms. Bell had substantial difficulty caring for herself, and her doctors tried a second medicine, Arimidex, which the side effects were also too severe.

29.

Because of the severe, life- altering side effects, the medication was changed again to Femara which also caused severe side effects.

30.

Ms. Bell started the last medication, tamoxifene. It also has severe side effects affecting Ms. Bell's daily life activities.

31.

The side effects experienced, include, hot flashes, hair loss, joint/bone/muscle severe chronic pain. Unusual sweating, nausea, diarrhea, major difficulty sleeping (even with trying several sleep medications) mental mood changes, depression, anxiety, severe shortness of breath, significant confusion and inability to focus, muscle weakness, significant vision changes at all ranges, and random tingling and numbness.

32.

Ms. Bell lost 23 lbs in two and half weeks as a result of one of the medications. These drugs nearly destroyed any ability of coping or concentration skills. The shortness of breath was so severe, Ms. Bell had been concerned that she was experiencing a heart attack and /or stroke. These medications can stop all production of any estrogen in the body which makes the severity of the side effects increase.

33.

In March of 2010, during Ms. Bell's short term disability leave, Mr. Allemand received instructions from Todd Pellegrin to "cut the fat" of Hercules Liftboat. Mr. Allemand was assigned a personal goal of preparing a report for Todd Pellegrin which included an analysis of improvements and restructuring that might make Liftboats division more efficient, productive and cost effective by preparing a report by September 30, 2010. The goal was not met, however, Mr. Allemand immediately began seeking authority to terminate Ms. Bell.

34.

By September, just weeks after returning from short term disability, Mr. Allemand sought permission from HR Houston office to terminate Ms. Bell.

35.

Ms. Bell discussed her suspicions that Mr. Allemand was attempting to fire her with Renee Pitre, CFO of Liftboats. On each occasion said that would never happen, and she assured Ms. Bell she was not going anywhere given her value as interpreted by her.

36.

This information about her condition and the effects of her post cancer medications were communicated to Mr. Allemand upon her arrival back and Hercules in July 2010, and HR at Hercules was aware of this during Ms. Bell's employment.

37.

Mr. Allemand was aware of her medical condition, health issues and difficulties with cancer treatment. Ms. Bell discussed her concerns with co-workers about her ongoing disability and her concerns for potential termination given the cost of her medical condition to Hercules a self insured entity. Mr. Allemond allowed Ms. Bell a modified work schedule and attempted to

facilitate accommodation of Ms. Bell until he received authority to terminate her employment.

38.

The attempted accommodations were to have her subordinate, employee, Dana Clark perform the function of some of her job duties which heretofor, Ms. Bell had performed in the past.

39.

Prior to Ms. Bell's termination corporate management had Ms. Bell scheduled to attend HERO II management training which she did attend in Houston, Texas. Ms. Bell applied the training of HERO II training of progressive disciplinary policy as outlined in that management training in relationship to the problems Ms. Bell was experiencing with Dana Clark since she returned from her disability time off. At the on start HR Mary Coffelt warned Dana in Ms. Bell's presence during a meeting that Dana's slanderous comments about Ms. Bell and her work product were grounds for immediate termination. During that meeting Mary Coffelt advised her that she placed significant authority with Hercules managers as Ms. Bell. Coffelt mandated a second meeting within the next weeks which two additional meetings took place with progressive documentation being provided by Mary Coffelt.

40.

Ms. Coffelt mentioned she may need to bring this to the attention of Mr. Allemand with regards to firing Clark if it became necessary. Ms. Bell requested that Mary Coffelt hold onto the progressive documents that it was Ms. Bell's intention to save the Hercules asset it held in Dana Clark., but found out shortly before Ms. Bell's termination that, Ms. Coffelt had provided all progressive disciplinary documents on Dana Clark to Byron Allemand after each meeting.

41.

Mr. Allemand terminated Ms. Bell in January 2011.  Just prior to Ms. Bell's termination, Dr. Blanchet, a cancer oncologist was scheduling a January 10 appointment, then rescheduled for January 21, 2011 appointment for a CT of the neck with contrast for a mass Ms. Bell now has on the back of her neck. Corporate HR would have had all of this private medical information.

42.

Ms. Bell's cancer condition, health issues and the serious side effects that were affecting her work product without accommodation was the reason that she was terminated from Hercules employment.

43.

No other Hercules employee had ever been terminated in re-organization by Hercules while Mrs. Bell was an employee.  She was the ONLY person terminated.

44.

On January 26, 2011, Ms. Bell was terminated.  On, the day of her termination, Coffelt and Ms. Bell remained in the conference room so that they could go over a severance package which included a release of any and all claims against the company, wherein it was explained that there would be no bonus or severance unless all claims were released against the company and other employees, although the bonus had already accrued to Ms. Bell's favor.

45.

Allemand appeared nervous during Ms. Bell's termination, stating only "your position has been terminated" and got up and left the conference room. No hand shake, no, thanks for your service, sorry about the circumstances, nothing. He also appeared agitated and angry.

46.

Allemand sent out an email the next day addressed to "PUBLIC LIFTBOAT" that read "Sue Bell is no longer with our team. Sue has been a hard worker for our company, and we wish her well. Any requests that would have normally have gone to Sue should be directed to Tim Reed".

47.

During the severance package review Ms. Bell asked Coffelt if her termination had anything to do with her progressive discipline of Dana Clark to correct ongoing issues and reinstate Ms. Clark's job responsibilities at a time Ms. Bell required accommodation, or due to other cancer issues. Ms. Coffelt never directly denied the termination was because of cancer disabling treatment, she simply stated that Mr. Allemand had been "reviewing" all employees for a year.

48.

Ms. Coffelt told Ms. Bell that others were also being terminated in a mass lay off, however, no one else in the Lift boat division was terminated except Sue Bell.

49.

Coffelt's multiple comments that other liftboat employees were being terminated at the same time was misleading Ms. Bell in an attempt to obtain her signature on a release.

50.

Ms. Coffelt then stayed and assisted Ms. Bell while she packed her personal belongings.

51.

Hercules is self insured.  At the time of the disability Ms. Bell was entitled to the benefit

of health insurance, medication, life, vision, dental and disability insurance.

52.

Ms. Bell drew short term disability due to radiation treatment for cancer from 2/7/10 to 7/18/10.

53.

Ms. Bell is required to be on five year post-cancer medication causing long term disability symptoms that began on the first prescribed medication date in March 2010.

54.

Ms. Bell has continued to seek treatment for her cancer. In January 2013, A Typical cells were found on her Thyroid and a larger cluster of cells was seen and was not aspirated because of depth and proximity to the aortic vein. The medical recommendation is to have ultra sounds every six months. Ms. Bell's health continued to faulter after the loss of her job.

55.

Ms. Bell has suffered loss of livelihood, a six figure yearly income, loss of medical life, medication, dental, life insurance and short-long term disability benefits. Ms. Bell lost her vision policy and the loss of Hercules stock which did not vest until after her termination, as well as emotional distress. Ms. Bell is presently incurring great difficulty in managing her ongoing serious health issues.

56.

Ms. Bell had planned retirement at the age of 68 which is irreversibly affected adversely given the loss of income and benefits since her termination date forward to her planned retirement age of 68. This loss of Hercules income will negatively affect the determination of her

social security retirement benefit, and future financial ability to care for herself and her continuing medical care needs. Current life essential needs that have added additional financial burdens due to her health issues.

57.

### FIRST CLAIM FOR RELIEF

Plaintiffs seek relief under for Discrimination on the basis of her disability.

58.

### SECOND CLAIM FOR RELIEF

Plaintiff seek relief in form of attorneys fees and cost pursuant to Federal law, and punitive damages pursuant to Federal law.

59.

### THIRD CLAIM FOR RELIEF

Plaintiff seek relief under Title VII or 42 USC § 2000e et seq., for which an administrative complaint has been administratively filed, and a right to sue has been issued for Ms. Bell, see exhibit "A".

60.

### JURY TRIAL REQUESTED

In accord with FRCP Rule 38, Plaintiffs pray for jury trial on all issues.

61.

Plaintiff prays for all relief which may be granted under federal law or equity including punitive damages and attorney fees and costs.

WHEREFORE, Plaintiff prays that Defendants be cited to appear and answer and that

after resolution of this matter that this Court enter Judgment in favor of Plaintiff against defendants with legal interest from the date of demand as follows:

    (1)    Lost back and front pay and all other lost employment benefits;

    (2)    For emotional and mental distress, pain and suffering, humiliation, embarrassment and loss of employment opportunity;

    (3)    Medical and pharmaceutical bills and services past, present and future;

    (4)    All litigation expenses and punitive damages;

    (5)    For attorneys fees and for costs as may be allowable by law;

    (6)    For all property damage and expenses incurred in this matter;

    (7)    For such other relief that the Court may deem just, equitable or proper.

Judicial.

Respectfully submitted:

_____
Charlotte C. McDaniel McGehee # 26411
Charlotte C. McDaniel McGehee APLC
6513 Perkins Road
Baton Rouge, LA 70808
Telephone: (225)389-6711
Fax: (225)372-2607

PLEASE SERVE:
THROUGH REGISTERED AGENT FOR SERVICE
CAPITOL CORPORATE SERVICES, INC.
8550 UNITED PLAZA BUILDING II, STE. 305
BATON ROUGE, LA 70809

VERIFICATION

I hereby verify that I have read the complaint and I attest that the facts stated therein are true and correct to the best of my knowledge, recollection and understanding.

_____
Sue Bell

Sworn to and subscribed before me this _____ day of _____, 2013 at _____ ,in _____.

_____
Notary Public

My commission expires at _____.